Matthis **KOLBECK, et al., Plaintiffs,**

v.

**LIT AMERICA, INC., et al., Defendants.**

**No. 95 Civ. 1420 (MBM).**

United States District Court, S.D. New York.

April 24, 1996.

**560**

Phillip Karasyk, Dienst & Serrins, New York City, John E. Dolkart, Dolkart & Associates (Attorney for Plaintiffs), Chicago, IL, for Plaintiffs.

Walter C. Greenough, Francine N. Tobin, Schiff Hardin & Waite, Chicago, IL, for Defendant LIT America, Inc.

Bradley J. Andreozzi, Mayer, Brown & Platt, New York City, Howard J. Roin, Robert M. Dow, Jr., Mayer, Brown & Platt, Chicago, IL, for Defendants Refco, Inc. and Leonard Alpert.

MUKASEY, District Judge.

Plaintiffs Georg Kolbeck *et. al.* are 32 German, Austrian, Swiss and Italian investors suing four brokerage companies—LIT America, Inc., Refco, Inc., Angus Jackson, Inc., and Augustine Management—and four individuals, Michael E. Rose, Leonard Alpert, John C. Jennison III, and Lawrence Rose, for fraud and conversion under the Commodity Exchange Act, ("CEA"), and fraud, negligence, and breach of fiduciary duty under New York common law. Defendants LIT America, Refco, and Alpert have moved jointly to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b), for failure to plead fraud with particularity, and Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. For the reasons that follow, defendants' joint motion is granted.

## I.

The following facts are alleged by plaintiffs in the complaint and attached documents, and on this motion, are construed in the light most favorable to the plaintiffs. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). Fed. R.Civ.P. 10(c) permits the court to consider any exhibits mentioned in and attached to the pleadings even on a Rule 12(b)(6) motion to dismiss. Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); 2A James W. Moore et al., Moore's Federal Practice ¶ 10.06 (2d ed. 1995). Review of and reliance on these supplemental documents on a motion to dismiss is permissible because their inclusion in the pleadings affords the opposing party notice and an opportunity to respond, and makes it unnecessary to convert the motion into one for summary judgment. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). Here, plaintiffs have attached several exhibits to their amended complaint, including notices of termination of their trading accounts with Christian Schindler, a German national now serving three years for embezzlement, and an alleged assignment of rights from Schindler to plaintiffs. Those documents will be

considered in addition to the complaint on this motion.

This action results primarily from the fraudulent financial activities of Schindler, who now resides in Bernau Prison outside Munich, Germany. (Compl. ¶ 15) In 1991, German authorities began investigating Schindler's financial activities and issued a warrant to arrest him for embezzlement. Schindler fled Munich for New York. (*Id.* ¶ 16)

Upon arrival in New York, Schindler established several companies to solicit money from Europeans for investment in the commodity futures and options markets in the United States. Schindler set up: (1) Falcon Investment Corp., incorporated in Delaware in 1991; (2) FIC, Inc., incorporated in the Cayman Islands in 1991; (3) Investment Banker's Brokerage, Inc., incorporated in Delaware in 1991; and (4) IB Brokerage, also known as IBB, incorporated in the Cayman Islands in 1990 (together, "the Schindler Companies"). (*Id.* ¶ 18) These companies operated out of offices at 52 Wall Street and 40 Wall Street in New York City, and offices in Miami, Florida. (*Id.* ¶ 20) Schindler never registered any of these companies with the Commodities Futures Trading Commission ("CFTC"), in violation of § 4d(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6d(1) (1988), even though he obtained a legal opinion from attorney Bradley Beckman, advising him of the need to do so. (Compl. ¶ 19)

Despite his failure to register, Schindler, through the Schindler Companies, solicited millions of dollars from German, Austrian, and other European nationals for investment in American commodities markets. In aid of this enterprise, Schindler employed German-speaking salesmen who "used high pressure sales tactics," with "the lure of quick profits and no risk, to convince clients to invest monies with his companies." (*Id.* ¶ 20) Schindler ultimately collected more than $6 million from foreign investors—approximately $4 million of which was contributed by plaintiffs in this case. (*Id.* ¶ 18)

In or about March 1991, one of Schindler's employees, Anthony Colazzo, introduced Schindler to Refco, Inc. and Leonard Alpert, two of the defendants in this case. Refco is a New York brokerage firm and futures commission merchant ("FCM"), that clears commodity futures trades for its investor customers. Alpert is an employee of Refco, and is registered as an associated person ("AP") of Refco under the CEA and as a member of the National Futures Association ("NFA"). (*Id.* ¶ 10) Although Colazzo allegedly explained to Alpert that Schindler was not registered with the CFTC, Alpert began dealing with Schindler without requiring him to register. Alpert also helped Schindler complete "commodity customer agreements that purported to show that no public customers were involved in the brokerage business between them," and that Schindler was investing exclusively his own funds. (*Id.* ¶ 24) This assertion that no public customers were involved apparently was submitted under oath to the CFTC. Plaintiffs contend that when made, this sworn statement was "false and a lie," and that "[a]t all times relevant herein, Defendant Alpert knew that Christian Schindler used F.I.C. Inc. as an illegal conduit and means to introduce commodity brokerage business to Defendant Refco without the necessity of registration under the CEAct as either a FCM, IB, CPO and/or CTA." (*Id.*) More specifically, plaintiffs contend that Alpert knew Schindler was investing other people's money, because in March 1991 Alpert allegedly spoke to Ernst Naderer, who is not a plaintiff in this action, about a trading account at Refco. (*Id.* ¶ 25) Plaintiffs do not allege anything about what Naderer and Alpert discussed, only that they had some conversation. Alpert earned a brokerage commission on every trade that Schindler made with Refco (*id.* ¶ 29), and he and Refco continued to work with Schindler and his companies until January 1993. (*Id.* ¶ 26)

Plaintiffs further allege that, contrary to the sworn statement described above, Alpert actively helped Schindler solicit money from members of the public, including plaintiffs. (*Id.* ¶ 25) To this end, plaintiffs allege, Alpert led tours of the New York Futures Exchange ("NYFE") trading floor and the Refco offices at One World Financial Center in Manhattan for Schindler and potential investors, including many of the plaintiffs in this action. (*Id.*

¶ 27) Plaintiffs contend that these tours occurred almost monthly—in or about February, March, April, May, June, July and December 1992, and in February and June 1993. These tours often lasted several hours, during which Schindler told his guests that Refco and Alpert were his trading partners, that investors would have individual accounts at Refco, and that Refco "would be looking out for the best interests of the clients." (*Id.* ¶ 30) Plaintiffs contend that Alpert "did nothing to correct these obvious lies, misstatements and half-truths," and that the plaintiffs who made the visits "believed that what they had been told by Christian Schindler was true, including but not limited to, the representation that he was the agent of the Defendant Refco or in the case of visits to the exchange floor with Defendant M. Rose that he was the agent of Defendant LIT." (*Id.*) Plaintiffs have not specified exactly what Schindler said, in what language Schindler spoke, or whether Alpert understood. Moreover, plaintiffs have made no allegations about statements made by Alpert or anyone else at Refco.

On one occasion in January 1992, Alpert showed Schindler and one of the plaintiffs, Dr. Thilo Lipkow, a prospectus for a Refco commodity pool called "Refco Global Futures Fund, Ltd." The complaint specifies that Alpert distributed the prospectus, and that he gave it to both Schindler and Lipkow. (*Id.* ¶ 31) Schindler began selling shares in this fund to his clients, including some of the plaintiffs, but Schindler actually diverted the money into his own fund, called the Global Futures Fund, Ltd. (*Id.*) Schindler eventually raised from plaintiffs more than $1.5 million for the Refco Global Futures Fund, which he diverted into his own Global Futures Fund, Ltd. (*Id.* ¶¶ 36–37).

In July 1992, at the suggestion of Lawrence Rose, one of Schindler's employees, Schindler began doing business directly with defendant LIT America and Lawrence Rose's brother, Michael Rose. (*Id.* ¶ 33) Before that time, Schindler used the services of Michael Rose on a "give up" basis only; *i.e.,* Michael Rose would fill Schindler's trades but then transfer them to another FCM, such as Refco, for confirmation. (*Id.*)

Plaintiffs allege that like Refco and Alpert, LIT and Michael Rose hosted Schindler and his customers at the NYFE trading floor on numerous occasions, although never at their offices. On these tours, plaintiffs allege, Michael Rose would "either affirmatively vouch for [Schindler's] credibility ... or simply go along with whatever sales pitch Christian Schindler choose [sic] to use at the time." (*Id.* ¶ 34) Plaintiffs have not specified the content of Schindler's sales pitches, what language they were made in, or whether Michael Rose understood them. Plaintiffs have alleged that Michael Rose "knew that Christian Schindler was doing business with members of the public, failed to be registered under the CEAct, engaged in high pressure boilerroom sales tactics, and charged excessive commissions and fees to his clients" (*id.*), and that LIT and Michael Rose accepted Shindler's Global Futures Fund for trading even though the prospectus reported Refco as the broker of record. (*Id.* ¶ 37).

Not surprisingly, Schindler's illegal activities generated a spate of public and private litigation. In October 1991, one of Schindler's Austrian clients, Paul Gunter Transportgesellschaft GmbH, sued Schindler and the Falcon Investment Corp. for fraud in New York Supreme Court, in an action styled *Gunter v. Schindler,* No. 91–29247 (Sup. Court New York County 1991) (*Id.* ¶ 26) In December 1992, Fredrich Wieder and Hans Gerd–Munch, two of the plaintiffs in this action, filed a complaint against the Schindler Companies in this court styled *Wieder v. F.I.C. Inc.,* 92 Civ. 9377 (MBM) (the "Wieder Action"). (*Id.* ¶ 35) The 30 other plaintiffs in this case were added to the Wieder Action on March 25, 1993.

In or about June 1992, the CFTC began investigating Schindler and his companies. As part of that investigation the CFTC issued document requests to Refco, asking in part for another affirmation that Schindler was not doing business with the public. Schindler signed a statement to that effect, and plaintiffs contend that Refco and Alpert "knew that it was false." (*Id.* ¶ 32) On April 26, 1993 the CFTC investigation culminated in the filing in this court of a civil complaint against Schindler and his companies for mul-

tiple violations of the CEA and its regulations. *Commodity Futures Trading Comm'n v. Schindler*, No. 93 Civ. 2765 (MBM), 1995 WL 635001 (the "CFTC Action"). In that action, by order dated October 30, 1995, I granted summary judgment for plaintiff CFTC and permitted the law firm of Gusrae, Kaplan & Bruno to withdraw as Schindler's counsel. *Commodity Futures Trading Comm'n v. Schindler*, No. 93 Civ. 2765, 1995 WL 635001 *1 (S.D.N.Y. Oct. 30, 1995). In a subsequent order, dated January 29, 1995 I again granted summary judgment for plaintiff in the CFTC Action, on different claims, ruling that Schindler and his companies: (1) acted as Futures Commission Merchants without registering as such, in violation of § 4d(1) of the CEA, 7 U.S.C. § 6d(1) (1994); (2) committed commodities fraud, in violation of § 4b(a)(i) of the CEA, 7 U.S.C. § 6b(a)(i) (1994); (3) made false commodities reports, in violation of § 4b(a)(ii) of the CEA, 7 U.S.C. § 6b(a)(ii) (1994); (4) acted as Commodity Pool Operators ("CPO") without being registered as such, in violation of § 4m(1) of the CEA, 7 U.S.C. § 6m(1) (1994); and (5) committed fraud as CPOs, in violation of § 4o (1) of the CEA, 7 U.S.C. § 6o (1) (1994). I permanently enjoined Schindler and his companies from further engaging in the prohibited conduct, froze all of their assets, and appointed Richard E. Nathan, Esq. Permanent Equity Receiver of their property.

On March 11, 1996 the Receiver issued a report on the status of defendants' assets. The Receiver concluded, *inter alia*, that it was unlikely that further assets would be obtained, and that the cost of pursuing any such assets greatly outweighed the likelihood of success. (Report of the Permanent Equity Receiver at 5) The Receiver also stated that he "is not aware of any facts that would support a good-faith claim on behalf of [Schindler and his companies] against [LIT, Refco, Angus Jackson and Augustine] or individuals or anyone else." (*Id.* at 6).

In July 1993, Schindler was arrested in Manhattan pursuant to an international extradition warrant issued by the prosecutor in Munich, Germany. The warrant, the product of the investigation that led to Schindler's flight to the United States, had been issued sometime in 1991 and internationalized in May 1993. (Compl. ¶ 14) Schindler was convicted of felony criminal fraud in Munich and sentenced to approximately three years in prison. An identical sentence was imposed in Traunstein, Germany in September 1995. Schindler is currently serving those sentences, and is scheduled to be released in April 1998. (*Id.* ¶ 15).

The plaintiffs in the present action first filed their complaint on March 1, 1995. After meeting with Schindler in Germany, plaintiffs filed an amended complaint on December 8, 1995, seeking relief on nine separate claims, denominated "counts." The first group of counts concern LIT, Angus Jackson, Jennison, Michael Rose and Lawrence Rose, of whom only LIT currently moves to dismiss: Count I alleges violations by LIT, Angus Jackson, Augustine, Jennison, Michael Rose and Lawrence Rose, of § 4b and § 4o—the anti-fraud provisions—of the CEA; Count II alleges a violation by LIT of § 4d, the conversion provision of the CEA, 7 U.S.C. § 6d; Count III alleges that LIT negligently did business with an unregistered trader; Count IV alleges breach of fiduciary duty by LIT, Angus Jackson, Augustine, Jennison, Michael Rose and Lawrence Rose; and Count V alleges common law fraud by Michael Rose, LIT, Angus Jackson, Augustine and Jennison. The last set of counts concerns only Refco and Alpert: Count VI alleges violations of § 4b of the CEA by Refco and Alpert; Count VII alleges Refco's negligence; Count VIII alleges Refco's and Alpert's breach of fiduciary duty; and Count IX asserts Refco's and Alpert's common law fraud. (Compl. ¶¶ 41–77) Defendants Refco, Alpert and LIT move to dismiss all of plaintiffs' claims against them. Because each of the counts includes one or more defendants presently moving to dismiss, each will be discussed in this opinion.

## II.

Subject matter jurisdiction for plaintiffs' federal claims arises from 28 U.S.C. § 1331, the federal question statute, and 7 U.S.C. § 25(c), the jurisdictional grant of the private right of action under the CEA. Subject matter jurisdiction for plaintiffs' state claims ex-

ists pursuant to 28 U.S.C. § 1367(c), the supplemental jurisdiction statute, and pursuant to 28 U.S.C. § 1332, the diversity-of-citizenship statute. Plaintiffs are all foreign citizens and defendants are all American citizens. Although plaintiffs have not specified how much each seeks, I will assume, for purposes of this motion, that each of the 32 plaintiffs seeks more than $50,000, as required by statute. *Zahn v. International Paper Co.*, 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973) ("multiple plaintiffs with separate and distinct claims must each satisfy the jurisdictional-amount requirement"). That assumption is appropriate here, where plaintiffs combined seek over $4 million. That sum divided by 32 (the number of plaintiffs) equals $125,000 and suggests that each plaintiff's claim exceeds the $50,000 statutory minimum. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events giving rise to both the federal and state claims occurred here.

### III.

■ In their Memorandum of Law plaintiffs suggest incorrectly that my January 29, 1996 ruling in the CFTC Action may have collateral estoppel effect on the present action. Collateral estoppel, or issue preclusion, provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Collateral estoppel requires: (1) an identity of issues, (2) that the issue necessarily have been decided, and (3) that the party against whom the bar is sought had a full and fair opportunity to litigate the issue in the prior suit. *See Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir.1994).

■ The judgment for the CFTC in the CFTC Action does not bar litigation of any of the issues in the present case. Those issues are not identical because that action concerns the liability of Christian Schindler while this action concerns the liability of the commodities brokers with whom Schindler traded.

As a consequence, most of the facts at issue here were not necessarily decided in the CFTC action. Even if some of the issues, such as Schindler's primary liability, were decided in the CFTC Action, the defendants in the present case, who were not parties or privies of a party to the CFTC Action, did not have a full and fair opportunity to litigate their liability in the CFTC Action. Accordingly, it is necessary to decide each of the issues raised on defendants' motion for the first time here.

### IV.

■ The Futures Trading Act of 1982 ("FTA") amended the CEA and codified an investor's private right of action for damages resulting from violations of the CEA. 7 U.S.C. § 25 (1994). Section 25(c) of Title 7 dictates that any private action for CEA violations "shall be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c) (1994). A claim under the CEA arises when plaintiffs are put on inquiry notice of a potential claim. That is, the claim accrues and the limitations period starts to run when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded. *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir.1994); *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). At that point, the investor assumes a duty of inquiry, and knowledge will be imputed to the investor even if he does not make that inquiry. *Dodds*, 12 F.3d at 350.

■ Plaintiffs first filed the complaint in this action on March 1, 1995. For his claim to be timely, each plaintiff must not have been put on inquiry notice before March 1, 1993, absent application of a tolling doctrine. However, it is clear that no fewer than eight of the 32 plaintiffs here had actual notice at least of Schindler's fraud well before March 1, 1993. The two plaintiffs who sued Schindler for fraud in December 1992—Wieder and Munch—plainly knew of Schindler's antics before March 1, 1993. Had Schindler's relationship with defendants been deliberately concealed or otherwise difficult to discov-

er, actual notice of Schindler's fraud might not translate into inquiry notice of defendants' alleged wrongdoing. But here, the allegations of agency in the complaint reveal that Wieder and Munch at least had inquiry notice, if not actual notice, by the time they filed their suit against Schindler, that Refco, Alpert and LIT may have helped Schindler to perpetrate his fraud. Accordingly, the CEA claims asserted by Wieder and Munch against Alpert, Refco and LIT are time-barred.

■ Six other plaintiffs also betrayed their awareness of Schindler's fraud on or before March 1, 1993 by demanding that Schindler return their money and by authorizing their attorney (the same attorney representing them here) to sue Schindler for CEA violations. (Comp. ¶ 38 & Ex. A–P) The exhibits attached to the complaint demonstrate that plaintiffs Anton Pfaab (3/1/93—Ex.A), Arno Slawinski (3/1/93—Ex.K), Andreas Walk (2/28/93—Ex.L), Hannelore Walk (2/28/93—Ex.M), Frederieke Jenewein (2/28/93—Ex.N) and Bernard Sernatinger (2/28/93—Ex.O) all sent official notices to Schindler that they were terminating their accounts with his investment companies, demanding the return of all monies, and seeking "the rescission of each and every trade made for my account based upon your fraudulent misrepresentations to me." (Compl.Ex. A) Further, each of the letters declares that the signatory has "retained and authorized my attorneys so named above to file immediate suit against you and any other responsible parties for inter alia fraudulent conversion and violations of the Commodity Exchange Act, as amended." (*Id.*)

At a minimum, these demands reveal that plaintiffs' suspicions of Schindler crystallized by March 1, 1993, and were conceived sometime before that date. As is true for Wieder and Munch, these plaintiffs' allegations of an agency or conspiracy relationship between Schindler and defendants required them to inquire into defendants' activities the moment they became aware of Schindler's misrepresentations. Accordingly, the CEA claims of these plaintiffs too are time barred.

■ Plaintiffs invoke the doctrine of equitable tolling and contend that none of their claims should be time-barred because defendants fraudulently concealed their relationship with Schindler. But plaintiffs may benefit from equitable tolling only if they have pleaded, with the particularity required by Fed.R.Civ.P. 9(b): (1) wrongful concealment by defendants, (2) which prevented plaintiffs' discovery of the claim, and (3) due diligence by plaintiffs in pursuing discovery of the claim. *Butala v. Agashiwala*, 916 F.Supp. 314, 321 (S.D.N.Y.1996). Plaintiffs here have not alleged any facts suggesting that defendants concealed their relationship with Schindler. To the contrary, plaintiffs have alleged repeatedly that defendants and Schindler flaunted their relationship and that that relationship was part of their modus operandi. Moreover, even if plaintiffs were found to have alleged concealment, they have alleged nothing to indicate their own due diligence. Accordingly, when plaintiffs took action against Schindler they were required also to investigate any potential misdeeds of Schindler's purported business partners and to act in a timely fashion, *i.e.*, within two years. The statute of limitations will not be equitably tolled.

As for the 24 remaining plaintiffs, a string of events occurring before March 1, 1993 taints their claim of ignorance and indicates that in all likelihood they too had inquiry notice of Schindler's misconduct more than two years before filing the complaint in this action. First, the lawsuits filed by Gunter in October 1991 and Wieder in December 1992 were, in plaintiffs' own words, "public accusations" of Schindler's fraud (Compl. ¶ 26), and should have signalled to the other plaintiffs here that something was awry. Second, Refco and Alpert stopped doing business with Schindler in January 1993, also more than two years before the filing of this complaint. Third, all plaintiffs in this action were joined as plaintiffs in the Wieder action by March 25, 1993, and must have been contacted in aid of that joinder well before that date. Fourth and finally, nine plaintiffs sent demand letters to Schindler shortly after March 1, 1993: Heider Anton (3/6/93—Ex.B), Matthias Kolbeck (3/15/93—Ex.D), Alfred Eicher (3/6/93—Ex.E), Georg Kolbeck (3/6/93—Ex. F), Johann Greimel (3/19/93—Ex.G), Thomas

Lohmeier (3/6/92—Ex.H), Franz Weindl (3/10/93—Ex.I), Franz Greimel (3/6/93—Ex. J), Ruth Wagner (3/16/93—Ex.P). Despite all these events, plaintiffs cling to the contention that they did not learn of defendants' involvement with Schindler until the CFTC filed its complaint against Schindler in May 1993. Although I think it likely that one or more of these events put each of the remaining 24 plaintiffs on inquiry notice before March 1, 1993, on this motion I will give plaintiffs the benefit of the doubt and will not dismiss their claims as time-barred.

## V.

The CEA authorizes recovery of damages from any person who violates the CEA, or who willfully "aids, abets, counsels, induces, or procures the commission of a violation of" the CEA. A potential plaintiff must be one:

(A) who received trading advice from such a person for a fee;

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of … [an option, a contract or an interest in a commodity pool]; or

(D) who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

7 U.S.C. § 25(a)(1) (1994).

Courts have understood that provision to list four disjunctive "conditions precedent," at least one of which must be met in order to bring a private action for violation of the CEA. *See Three Crown Ltd. Partnership v. Caxton Corp.*, 817 F.Supp. 1033, 1042–43 (S.D.N.Y.1993) (allegation that defendants manipulated the price of futures contracts other than the ones purchased by plaintiffs does not satisfy § 25(a)(1)(D)); *Grossman v.*

*Citrus Assocs. of the New York Cotton Exch., Inc.*, 706 F.Supp. 221, 230–31 (S.D.N.Y.1989) (dismissing complaint for failure to meet CEA's "conditions precedent"); *In re Soybean Futures Litig.*, 892 F.Supp. 1025, 1042 (N.D.Ill.1995); *Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 878 F.Supp. 1156, 1161 (N.D.Ill.1995); *Davis v. Coopers & Lybrand*, 787 F.Supp. 787, 795 (N.D.Ill. 1992) (§ 25(a)(1) limits the statutory remedy "to obtaining damages from the persons who sold or took orders for interests in the commodity pool"). That is, in order to sue a defendant for violation of the CEA, the plaintiff must have one of the four listed relationships with the defendant.

Here, plaintiffs have not met any of the conditions precedent because they have none of the listed relationships with these defendants. Nowhere in the complaint is it alleged that plaintiffs received trading advice from Refco, Alpert, or LIT, or any of the other defendants, nor is it alleged that plaintiffs contracted with any of the defendants to buy or sell futures. Accordingly, any claims of fraud or conversion that plaintiffs assert against defendants directly must be dismissed for failure to meet any of the CEA's conditions precedent.

Plaintiffs seek two ways around rather than over the statutory hurdle. Plaintiffs argue that they have standing because: (1) Schindler assigned to plaintiffs his right to sue these defendants, and (2) defendants are vicariously liable under the CEA for the acts of their agent Schindler. In other words, plaintiffs argue that their claims are proper because either plaintiffs stand in Schindler's shoes with respect to defendants, or because defendants stand in Schindler's shoes with respect to plaintiffs. The threadbare stitches of Schindler's shoes come apart under the weight of either theory.

### A. *Plaintiffs' First Theory*

Plaintiffs' first theory arises from a document Schindler executed in his German prison cell on December 1, 1995. (Compl.Ex. Q) In that document, entitled "Assignment," Schindler, individually and on behalf of F.I.C., Inc. and Global Futures Fund, Ltd.

assigned any and all rights that they may have in connection with the purchase and sale of commodity futures and options in the accounts at Refco, Inc., L.I.T. America, Inc., and any other commodity broker from the beginning of time until the present to the private party plaintiffs in 95 Civ. 1420 captioned Matthias [Matthis] Kolbeck et. al. v. L.I.T. America, Inc. et. al. (S.D.N.Y.) and any other customer of the same without limitation to the fullest extent possible under the laws of the State of New York and the laws of the United States of America.

(*Id.*) Accordingly, plaintiffs argue, they have met one of the statutory prerequisites and have standing to sue defendants for violations of the CEA because Schindler purchased contracts for commodity futures directly from Alpert, Refco and LIT. 7 U.S.C. § 25(a)(1) (1994).

▬▬▬▬ But even assuming the validity of the assignment, although it would endow plaintiffs with standing if Schindler had a viable claim, it does not give them the substantive rights they seek. "[A]n assignee gets no better rights than those of his assignor." *Trans–United Indus., Inc. v. Cohn,* 351 F.2d 605, 606 (2d Cir.1965). If the assignor transfers a right to certain payment, the assignee takes that right subject to any superior claims. *Active Fire Sprinkler Corp. v. United States Postal Serv.,* 811 F.2d 747, 755 (2d Cir.1987). Similarly, when an assignor transfers a right to sue a third party, the assignee receives the same legal rights against that third party as the assignor would have had had he not made the assignment—no more and no less. *United States v. Foster Wheeler Corp.,* 639 F.Supp. 1266, 1269 (S.D.N.Y.1986).

▬▬▬▬ Schindler's assignment is useless to plaintiffs because the complaint does not allege any facts to show that Schindler has any rights under the CEA against defendants LIT, Refco or Alpert. Plaintiffs do not allege that LIT, Refco or Alpert made any misrepresentations to Schindler or cheated him in any way. Indeed, as the parties to this lawsuit and several others are painfully aware, Schindler himself is the liar and cheat. Schindler's dearth of legitimate claims against these defendants has been

confirmed by the Receiver, who has stated that he "is not aware of any facts that would support a good-faith claim on behalf of any of the defendants against those firms or individuals or anyone else." (Report of the Permanent Equity Receiver at 6).

### B. *Plaintiffs' Second Theory*

In the alternative, plaintiffs contend that they have standing to sue Schindler because they purchased futures from him, and because Schindler was defendants' agent, defendants are vicariously liable for his conduct within the scope of the agency relationship. Plaintiffs build their agency argument on § 2(a)(1) of the CEA, which states:

> For the purpose of this chapter the act, omission, or failure of any ... agent ... acting for any ... corporation ... within the scope of his employment or office ... shall be deemed the act, omission, or failure of such ... corporation ... as well as of such ... agent....

7 U.S.C. § 4 (1994).

▬▬▬▬ Defendants oppose plaintiffs' theory first on the ground that the private right of action under the CEA—7 U.S.C. § 25—is entirely self-contained and does not incorporate the respondeat superior principles of 7 U.S.C. § 4. Here, defendants rely upon the declaration by Congress that § 25 is the "exclusive remed[y] under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter." 7 U.S.C. § 25(a)(2) (1994). This section, they argue, limits private actions to those explicitly detailed in § 25 and prohibits all other private CEA actions. Defendants also rely on cases holding that the independent aiding and abetting provision of the CEA—7 U.S.C. § 13c(a)—is not incorporated into the private right of action. *Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 878 F.Supp. 1156, 1161 n. 3 (N.D.Ill.1995); *Davis v. Coopers & Lybrand,* 787 F.Supp. 787, 795 & n. 13 (N.D.Ill.1992).

Defendants' argument proves too much. If vicarious liability were barred by 7 U.S.C. § 25, a plaintiff could sue only the individual broker from whom he purchased trading advice or a commodity future. On defendants'

theory, that plaintiff could not sue the broker's principal, even when the principal indisputably was the broker's employer. That reading of the CEA would gut the private right of action and could not be consistent with Congress' intent. The CEA's own definition of "person" includes "associations, partnerships, corporations, and trusts," 7 U.S.C. § 2 (1994), in recognition that a corporation cannot sell commodities, but that a corporation may be held responsible when its human agents engage in commodities fraud.

Defendants rely on cases holding that 7 U.S.C. § 13c(a), the section of the CEA that provides generally for aiding and abetting liability, does not apply to § 25. *Damato*, 878 F.Supp. at 1161 n. 3; *Davis*, 787 F.Supp. at 795 & n. 13. From this authority defendants argue that neither should 7 U.S.C. § 4, the section of the CEA that provides generally for respondeat superior liability, apply to § 25. However, defendants have overlooked the impact of § 25 itself on their reasoning. Section 25 contains its own aiding and abetting language that is both explicit, and, by its terms, exclusive—*i.e.*, it represents the only basis for imposing aiding and abetting liability in a private action. 7 U.S.C. § 25(a)(2) ("the rights of action authorized by this subsection ... shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter."). Thus, not only is there no need to resort to the general aiding and abetting section, but such resort is explicitly barred. By contrast, § 25 contains no language imposing respondeat superior liability. Therefore, it is entirely permissible to rely on the general respondeat superior section of the statute, 7 U.S.C. § 4, as the basis for imposing such liability absent any reason to conclude that Congress did not intend for § 4 to apply to § 25. There is no such reason. Accordingly, if Schindler was defendants' agent, and if plaintiffs properly pleaded Schindler's fraud, plaintiffs could hold defendants vicariously liable for that fraud.

■ The problem here, however, is that plaintiffs have not properly pleaded their claim for fraud under the CEA. Fed. R.Civ.P. 9(b) requires that in all averments of fraud, the "circumstances constituting fraud ... shall be stated with particularity." This rule aims to: (1) give a defendant fair notice of plaintiffs' claim and allow it to prepare a defense, (2) protect a defendant's reputation from baseless allegations of deceit, and (3) reduce the likelihood of "strike" suits—meritless suits initiated to coerce defendant to settle. *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

■ Rule 9(b) requires a plaintiff to state the "time, place, speaker and content of the alleged misrepresentations." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). At a bare minimum, plaintiffs must state who said what to whom, and when and where they said it. Shadowy and suggestive gossip-column-style innuendos do not suffice. Further, the complaint must allege that the defendant intended to defraud, or at least allege facts creating an inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). Rule 9(b) applies with equal force to all claims of fraud—whether they arise under state law, the CEA, or other federal law. *Karasyk v. Marc Commodities Corp.*, 770 F.Supp. 824, 829 (S.D.N.Y.1991).

■ Plaintiffs' amended complaint—their second chance at specificity—epitomizes many of the abuses Rule 9(b) was supposed to end. The complaint describes both Schindler's alleged fraud and his purported agency relationship with defendants in the vaguest of terms. Plaintiffs assert repeatedly that Christian Schindler improperly failed to register under the CEA, that Schindler defrauded them of over $4 million, and that Schindler and defendants led tours of the exchange floor, but plaintiffs fail to state exactly what Schindler said, when he said it and to whom he said it. There are 32 plaintiffs in this case, but the complaint hardly ever differentiates among them. Rather, the complaint egregiously violates the requirement that the audience and content of the fraud be detailed with specificity, and ambiguously asserts that Schindler lied to some of the plaintiffs some of the time. *See Butala v. Agashiwala*, 916 F.Supp. 314, 322 (S.D.N.Y.1996) ("Insofar as the Complaint

does not identify the specific plaintiffs to whom enumerated communications were made, and fails to state times and places for those communications, or indeed, what was said, it is not pleaded with sufficient particularity.").

Typical of plaintiffs' pleading style is their claim that Schindler "employed German speaking salesmen who used high pressure sales tactics to solicit the Plaintiffs and other Germans, Austrians and other European nationals to invest monies in the commodity futures and options markets in the United States." (Compl. ¶ 20) Plaintiffs do not specify who these salesmen were, what they said, to whom they said it, or which investments they were recommending. Elsewhere in the complaint, plaintiffs' state that "[a]t various times from in or about January 1992, defendant Alpert assisted Christian Schindler in the solicitation of clients, including some of the plaintiffs, by giving him access to the NYFE exchange floor and to the corporate offices of Defendant Refco." (Id. ¶ 27) Plaintiffs do not state the dates on which these tours occurred, which plaintiffs were present on which tours, or what specifically was said by either Schindler or Alpert to solicit plaintiffs' investments. As for LIT, plaintiffs sweepingly accuse Michael Rose of simply going along with "whatever sales pitch Christian Schindler chose to use at that time." (Id. ¶ 34) Plaintiffs never even allege that Michael Rose is an employee or agent of LIT, but only that he was a principal of defendant Angus Jackson, and that he acted as a floor broker for trading accounts at LIT and Refco. (Id. ¶ 7) Plaintiffs also never specify what sales pitch Rose went along with at what time. Simply put, these foggy allegations do not comply with Fed.R.Civ.P. 9(b), in that they fail to notify defendants of either Schindler's or their own alleged wrongdoing and make it close to impossible to prepare a defense.

■ To the extent that plaintiffs claim Schindler and defendants conspired to fraudulently induce plaintiffs "to invest moneys and property with the Schindler Companies by means of false misrepresentations, untrue statements, omissions of material facts, [and] manipulative and deceptive conduct" (Id.

¶ 39), and that defendants made Schindler their agent—either under the doctrine of apparent authority, ratification, or agency by estoppel—as part of this intrigue, plaintiffs' claims of agency also must comply with Rule 9(b). In a case involving multiple defendants, Rule 9(b) mandates that the complaint inform each defendant of his alleged role in the deception. Broad allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b). *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F.Supp. 608, 620–21 (S.D.N.Y.1990).

■ The requirement of precision applies equally when the goal is to hold defendants vicariously liable for the fraud of another and when the agency relationship itself allegedly is part of the fraud. When an implied agency relationship is allegedly part of the fraud, "the circumstances constituting the fraud" on the part of the purported principal include both the facts constituting the underlying fraud and the facts establishing the agency relationship. *See Pershing Div. of Donaldson, Lufkin & Jenrette Secs. Corp. v. Sirmer*, 1989 WL 165155, * 6–7 (N.D.Ill. Dec. 27, 1989) ("Because the objectives underlying Rule 9(b) apply with equal force to allegations against the employer of a violator, this court will examine the derivative liability claim in the light of the particularity requirements of Rule 9(b)."); *see also Pits, Ltd. v. American Express Bank Int'l*, 911 F.Supp. 710, 715 (S.D.N.Y.1996) (holding that showing of domination and control to advance alter ego theory of veil piercing must be made with greater particularity when alleging that the controlled corporation perpetrated fraud).

Here, the nexus between the fraud and the agency is particularly close because plaintiffs' claim that the agency itself was a fraud, and that defendants created the appearance of an agency relationship to facilitate Schindler's perpetration of commodities fraud. That theory, like any theory of estoppel, derives from principles of fraud and implicitly incorporates an allegation that the agency rela-

tionship itself played some part in the fraud. *See* Restatement (Second) of Agency § 8B cmts. a, c (1958). Specifically, plaintiffs contend that because defendants stood silent in the face of Schindler's alleged representations of agency, and because defendants implicitly condoned Schindler's failure to register and his false statements to the CFTC, defendants are now estopped to deny that agency. Plaintiffs base their theory of agency by estoppel on Schindler's statements made in either Alpert's or Michael Rose's presence, statements which they characterize as lies in furtherance of a conspiracy to defraud, and statements which plaintiffs themselves are in the best position to recount. By structuring their claim in this way, plaintiffs have assumed responsibility not only to plead the underlying fraud, but also the fraudulent agency, with Rule 9(b) particularity.

Plaintiffs' allegations of agency are as murky as their allegations of fraud. The complaint states that

> during these visits, Christian Schindler would tell the clients, including some of the plaintiffs, that Defendants Refco and Alpert were his trading partners, that customers would have individual accounts at Defendant REFCO; and that they would be looking out for the best interests of the clients. Defendant Alpert did nothing to correct these obvious lies, misstatements and half-truths. At the conclusion of these visits, the Plaintiffs who had made the visits reasonably believed that what they had been told by Christian Schindler was true, including but not limited to the representation that he was the agent of the Defendant Refco or in the case of visits to the exchange floor with Defendant M. Rose that he was the agent of Defendant LIT.

(Compl. ¶ 30) The first sentence of the quoted passage contains at least seven omissions: (1) the dates on which "these visits" occurred, (2) who "the clients" were on each occasion, (3) who "some of the plaintiffs" were, (4) what it means to be "trading partners," (5) which "customers" would have individual accounts, (6) who would be "looking out" for and (7) which "clients'" interests.

The indirect mention of Schindler's representation that he was the agent of Refco and LIT, in the last sentence of the quoted section, fails to specify what that agency relationship entailed and permitted. Plaintiffs do not assert that Schindler told them that defendants had commissioned him to act in their behalf. These vague assertions of agency—whether described as agency by apparent authority, ratification, or estoppel—do not put defendants on notice of the claims against them, or enable them to prepare a defense.

Perhaps plaintiffs themselves best capture the effect of their own pleading defects when, on the third page of their response to defendants' motion, they state:

> Defendants have misconstrued the complaint and the nature of their liability to Plaintiffs both under the Commodity Exchange Act, as amended, and the laws of the State of New York based on agency and vicarious liability. Much if not all of their Motion to Dismiss and Memorandum is therefore irrelevant.

(Pl. Response at 3) If defendants misconstrued the complaint, that is not at all startling given the pleadings; what is notable is not what defendants allegedly missed, but what they caught.

Accordingly, because the complaint fails to state the circumstances of Schindler's fraud, and correspondingly, defendants' fraud—either under the CEA or New York law—with the requisite particularity, those fraud claims are dismissed. Moreover, because this is defendants' second motion to dismiss, and because plaintiffs already have been afforded an opportunity to make their allegations more specific, leave to replead is denied. *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987); *Armstrong v. McAlpin*, 699 F.2d 79, 93–94 (2d Cir.1983).

## VI.

Plaintiffs next contend that LIT is liable to them for conversion under the CEA. Section 4d of the CEA, 7 U.S.C. § 6d, requires an FCM to treat all funds received from a customer "as belonging to such customer." Plaintiffs contend that defendant LIT converted plaintiffs' funds in violation of that

section by refusing "to honor the plaintiffs' demands to liquidate their investments in the Schindler Companies and the Global Futures Fund, Ltd." (Compl. ¶ 47) Fifteen plaintiffs sent these demands to Schindler at F.I.C. Inc., and sent copies to Robert Fivian, Vice Chairman of LIT. (*Id.* Ex. A–P) Plaintiffs never received their money. Although plaintiffs sent these demands to Schindler, plaintiffs assert "upon information and belief" that these demands were communicated to M. Rose and that LIT and M. Rose ignored the demands. (*Id.* ¶ 38) Unlike claims of fraud, claims of conversion are not governed by Rule 9(b) unless the conversion itself is premised on fraudulent conduct. *Bank of Vermont v. Lyndonville Savs. Bank & Trust Co.*, 906 F.Supp. 221, 227 (D.Vt.1995).

 Plaintiffs' argument appears to be that M. Rose was LIT's agent, that Schindler was M. Rose's agent, and that therefore LIT may be held vicariously liable for Schindler's refusal to honor plaintiffs' demands for liquidation. But even assuming that M. Rose was LIT's agent, and that LIT made Schindler its agent—an assumption that requires several leaps of faith—plaintiffs have not alleged anything to indicate that Schindler's refusal to liquidate plaintiff's funds in *his* accounts was within the scope of any agency relationship he may have had with LIT, as required by the respondeat superior provision of the CEA, 7 U.S.C. § 4. The demand letters ask only that Schindler terminate and refund money from plaintiffs' accounts with Schindler's company, F.I.C. Inc. The letters say nothing about accounts at LIT and make no requests of Fivian or anyone else at LIT. Moreover, the complaint is devoid of allegations linking LIT specifically to F.I.C. Inc. or empowering LIT to act on behalf of F.I.C. To hold LIT responsible for acting on plaintiffs' demands would require an inference inverse to the thrust of the complaint—the inference that LIT was either Schindler's or F.I.C.'s agent, rather than Schindler being theirs. To be sure, LIT was Schindler's investment agent, in that LIT traded Schindler's money on the futures exchange. But there is absolutely no fact alleged that suggests Schindler empowered LIT to liquidate his accounts absent express instructions from

him. Accordingly, plaintiffs claim that LIT violated § 4d of the CEA must be dismissed.

## VII.

Plaintiffs contend also that defendants were negligent under New York law for doing business with an unregistered commodities trader. Defendants first challenge plaintiffs' claim on the ground that it is preempted by the CEA. But the numerous issues surrounding the extent and source of preemption themselves present a decisional thicket. *Compare American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1155–57 (7th Cir.1992) (relying on 7 U.S.C. § 2, the jurisdictional provision of the CEA, and holding that "[l]aws of general application ... are preempted only when plaintiffs attempt to use them in a manner that would, in effect, regulate the futures markets") *with Kotz v. Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207–08 (9th Cir.1982) (relying on the same provision, 7 U.S.C. § 2, but concluding that the CEA preempts state laws only if they would "render the regulatory scheme ineffective") *with Strobl v. New York Mercantile Exch.*, 561 F.Supp. 379, 385 (S.D.N.Y.1983) (holding that 7 U.S.C. § 2 preempts state regulation of commodities markets, but does not preempt all state common law remedies) *with Sall v. G.H. Miller & Co.*, 612 F.Supp. 1499, 1504 (D.C.Colo.1985) (looking to an entirely different provision, 7 U.S.C. § 25(a)(2) and concluding that it preempts alternative state-law theories of CEA liability, but that it does not preempt state common law remedies). Mercifully, I need not negotiate that thicket. I am saved that task by the utter inadequacy of plaintiffs' negligence claim. To put it quite simply, there is nothing to preempt.

 To prevail on a claim of negligence in New York, plaintiff must show that: (1) defendant owed a duty of care to plaintiff, (2) defendant breached that duty, and (3) defendant's breach proximately caused injury to plaintiff. *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir.1995). Plaintiffs here have failed to plead a basic element of a negligence claim—the existence of a duty of care. Securities brokers do not owe a general duty of care or disclosure to the public

simply because they are market professionals. *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 15 (2d Cir.1983) (broker had no duty to disclose), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). A duty of care arises only when the broker does business with the plaintiff. Then, the duty of the broker is to attend to the plaintiff's business with due care.

Here, plaintiffs once again urge me to focus on the tours. They state: "[w]e first need only look to [defendants'] voluntary actions to see that their association with Christian Schindler for purposes of the 'dog and pony' show (tours of Refco's offices in New York and visits to Refco's and M. Rose (agent for LIT) on the floor of the futures exchanges in New York over a period of a year) and interaction with the Plaintiffs, triggered a duty." (Pl.Mem. at 33) Plaintiffs' theory appears to be that although defendants did not have a duty solely because of their status, defendants voluntarily undertook to act on behalf of plaintiffs and thereby assumed a duty to act with care.

█ In support, plaintiffs cite *Kurzweg v. Hotel St. Regis Corp.,* 309 F.2d 746, 747 (2d Cir.1962) (holding that when it provided a doorman, hotel undertook obligation to ensure that doorman would act with care), *Brown v. Stinson,* 821 F.Supp. 910, 915 (S.D.N.Y.1993) (defendant undertook a duty of care by taking plaintiff's money and purchasing an African mask on plaintiff's behalf), and *Dashinsky v. Santjer,* 32 A.D.2d 382, 385, 301 N.Y.S.2d 876, 881 (2d Dep't 1969) (holding that a breach of a statutory duty to a person within the protected class creates civil liability). Although these cases illustrate that one who voluntarily assumes responsibility must exercise that responsibility with care, they do not aid plaintiffs' negligence claim because they all present facts that establish clearly the one element absent here—that defendants undertook a duty to act with care with respect to plaintiffs.

The hotel that decided to provide a doorman in *Kurzweg* and the investment advisor that agreed to execute a transaction in *Brown* both voluntarily accepted responsibilities to others that they otherwise would not have been required to fulfill. Here, defendants' only contacts with plaintiffs were the tours of the NYFE trading floor and Refco's offices. Plaintiffs have not alleged that defendants said anything to plaintiffs on these tours, or on any other occasion, by which they assumed a duty of care. *Dashinsky* also is inapposite, because there the defendant directly breached a statutory duty. Here, although Schindler violated the CEA in his failure to register, defendants have not violated any federal or state statute in their failure to remedy Schindler's omission. Accordingly, plaintiffs' state law negligence claim must be dismissed.

### VIII.

Counts IV and VIII of plaintiffs' complaint allege that LIT and Refco and Alpert, respectively, breached their fiduciary duty to plaintiffs. The complaint states, *inter alia,* that defendants "were fiduciaries with respect to the Plaintiffs and occupied a position of special trust and confidence with them because of the power and authority over which their agent Christian Schindler controlled their accounts." (Compl. ¶¶ 54, 71) This claim suffers from the same defect as plaintiffs' negligence claim and must be dismissed because plaintiffs have failed to allege facts that demonstrate any duty owed by defendants to these plaintiffs. Just as plaintiffs have failed to allege facts demonstrating that defendants owed them a duty of care, so they also have failed to allege facts demonstrating that defendants owed them fiduciary duties of trust, confidence or loyalty. That plaintiffs may have regarded defendants as their fiduciaries is not enough to establish a fiduciary duty when that duty otherwise would not exist.

█ In their brief, plaintiffs' claim for breach of fiduciary duty has been transformed into a claim for participating in another's breach of fiduciary duty. To prove that claim under New York law, a claimant must allege: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach. *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2d Cir.1987).

This cause of action is based on the principle that "one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust." *Id.* at 848 (citations omitted).

■ Plaintiffs' new theory seems to be that Schindler owed a fiduciary duty to plaintiffs, he breached that duty, defendants knowingly participated in that breach, and plaintiffs suffered damages as a result. Because plaintiffs' belated claim does not appear anywhere in the complaint, even under the most generous reading, it is inappropriate to address that claim in this opinion. If, after reading this opinion, plaintiffs wish to replead their claim for participation in a breach of fiduciary duty, the terms upon which they may do so will be discussed at a forthcoming conference.

\*　　\*　　\*

For the reasons explained in this opinion, defendants' joint motion to dismiss is granted.

SO ORDERED.