Bradley N. ROTTER, Plaintiff,

v.

John D. LEAHY, Jr. and Dennis Maloney, Defendants and Third–Party Plaintiff John D. Leahy, Jr.,

v.

John L. Johnston, Third–Party Defendant.

No. 97 CIV. 8778(RWS).

United States District Court, S.D. New York.

April 21, 2000.

Corbin, Silverman & Sanseverino, New York, NY (Marc Gottridge, Of Counsel), Chapman and Cutler, Chicago, IL (Timothy J. Carey, Brigitte T. Nuss Kocheny, Of Counsel), for Plaintiff.

Steven R. Goldberg, New York, NY, for Defendant John D. Leahy, Jr.

Scotto, Georgoulis & Dockery, New York, NY (William J. Dockery, Of Counsel), for Defendant Dennis Maloney.

DeForest & Duer, New York, NY (Jeffrey G. Glen, Of Counsel), for Third–Party Defendant John L. Johnston.

## OPINION

SWEET, District Judge.

Third-party defendant John L. Johnston ("Johnston") has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings to dismiss the third-party complaint (the "TPC") of defendant John D. Leahy, Jr. ("Leahy"). Leahy has moved, pursuant to Rules 15(a) and 13(f), to amend his answer to the complaint (the "Complaint") of plaintiff Bradley N. Rotter ("Rotter"), and to amend his TPC against Johnston. Defendant Dennis Maloney ("Maloney") has moved, pursuant to Rules 56 and 11, for summary judgment to dismiss the claims of the Complaint set forth against him, and for sanctions. For the reasons set forth below, the motions will be granted in part and denied in part.

### The Parties

Rotter, at all times relevant to the Complaint in this action, was a California resident. He is currently a Nevada resident.

Leahy is a New Jersey resident and, at all times relevant to the Complaint in this action, was a member of the New York Mercantile Exchange ("NYMEX").

Maloney, at all times relevant to this action, was a NYMEX member and had a principal place of business in New York, New York.

Johnston is a New Jersey resident.

### Prior Proceedings

Rotter filed his Complaint against Leahy and Maloney on November 25, 1997. Leahy filed an answer to the Complaint, and filed his TPC against Johnston, on January 8, 1998. Maloney filed his answer to the Complaint on January 28, 1998. Johnston filed his answer to the TPC on April 8, 1998.

Discovery proceeded. Johnston filed his instant motion to dismiss the TPC on September 29, 1999. Leahy served his motion to amend both the TPC and his answer to the Complaint on or around November 23, 1999. Briefing papers relating to these motions were received through January 19, 2000, when the Court heard oral argument and at which point the motions were deemed fully briefed.

### Facts

The facts set forth below are drawn from the Complaint, the TPC, the Rule 56.1 Statements, and the additional submissions of the parties. Facts material to Maloney's summary judgment motion, where disputed, are construed in the light most favorable to Rotter. Facts material to Johnston's motion to dismiss, which the Court is treating as a motion for summary judgment since materials outside the pleadings were submitted in connection with the motion, are construed in the light most favorable to Leahy.

Johnston and Leahy are former owners and directors of Institutional Brokerage Corp. ("IBC"), a Delaware corporation which provided floor brokerage services on various New York commodity futures exchanges from 1987 until approximately April 1994. Leahy became a shareholder and director on July 1, 1991. Previously, he was an IBC employee who traded crude oil futures contracts at the NYMEX for IBC customers.

Maloney has been since at least January 9, 1991 a NYMEX member. His NYMEX badge name is "SLIP." He has never been an IBC principal or employee.

During the time relevant to this action, Rotter had an office at the Echelon Group in San Francisco, from which he conducted trading activities. On January 1, 1988, he entered into an agreement with IBC to place trades for execution on the NYMEX for his account directly with IBC.

January 9, 1991 was a volatile day at the NYMEX. Iraq had occupied Kuwait and then-Secretary of State James Baker was in talks with Iraqi Foreign Minister Tariq Aziz, attempting to reach a diplomatic solution to the crisis. In anticipation of a public announcement from Baker, customers were on telephone calls with NYMEX crude oil traders ready to place buy or sell orders, since prices were expected to move sharply in one direction or other depending on the outcome of the talks. At approximately 1:53 p.m. Eastern Standard Time, Rotter phoned the IBC order desk on the NYMEX floor. About the time of Baker's announcement that "regrettably" a diplomatic solution had not been reached, Rotter placed an order to buy 100 February crude oil futures contracts "at the market" (the "Order"). An IBC telephone clerk accepted the Order and gave it to Leahy for execution in the pit. At approximately the same time, IBC's telephone clerks received two other "at the market" orders to buy a total of 45 February crude oil futures contracts.[1] Rotter waited on the phone for approximately twenty-three minutes with IBC for confirmation of the price at which the Order was executed, but could not receive confirmation over the phone.

According to Rotter's confirmation statements, Leahy filled the Order at the following quantities and prices:

25    contracts at $25.50
20    contracts at $28.00
30    contracts at $29.00
10    contracts at $29.85
14    contracts at $29.80
1     contract at $26.20

According to the Price Change Register of NYMEX, the earliest time at which a $25.50 price could have been executed on the afternoon of January 9, 1991 was 13:58:05. The earliest time the $29.80 price could have been achieved was

---

1. Basically, the customers were hoping to jump in at the beginning of the expected price run-up and make a nice profit.

14:08:47. Thus, Leahy took at least eleven minutes to execute the Order. February crude oil futures contracts traded at fourteen different prices, ranging from $23.70 to $26.00, between 13:53:59 and 13:58:05.

Rotter, a sophisticated commodities trader, suspected malfeasance in connection with the placing of the Order: that IBC had failed to execute the Order at the best market price available at the time, and had misallocated the execution of trades made for Rotter's account to accounts of other IBC customers. He filed a complaint against IBC with the Compliance Department of NYMEX in January 1991.

Rotter subsequently sued IBC, Johnston, and Bruce L. Cleland ("Cleland"), another IBC principal, in January 1993 in the Northern District of California, seeking recovery of the money he allegedly lost in the January 9, 1991 trade under claims of breach of contract, common law fraud, fraud under the Commodity Exchange Act, and breach of fiduciary duty (the "1993 Action").

At some point after the initiation of the 1993 Action, Rotter received, pursuant to discovery, Leahy's trading card No. AA694536, which listed the trades Leahy made to fill the Order. Although there were at least two "versions" of this trading card, only one was produced at the time. The produced card showed a blank line above a trade buying 30 February crude oil futures contracts at $29.00 from "SLIP" (i.e., Maloney). Directly across from that entry on the same line was another entry reflecting the sale of 30 March crude oil futures contracts to Maloney at $25.00.

Typically, a buy and sell order entered on the same line indicates a spread. However, under NYMEX Rule 6.08A, a spread trade consisting of different delivery months·on the buy and sell side can only be executed if both trades are for the same customer. While the 30 February contracts at $29.00 were allocated to fill partially Rotter's Order, Rotter did not trade March crude oil contracts on January 9, 1991; therefore the listing of the two trades on the same line did not indicate a spread trade.

NYMEX Rule 6.90 requires that "[a]ll transactions must be recorded in exact chronological order of execution on sequential lines of the trading card without skipping lines between trades." Thus, Leahy's trading card contained a record-keeping violation, since he could not have executed the 30 February trades at $29.00 and the 30 March trades at $25.00 at the same time.

The 1993 Action was transferred to this District and dismissed as to Johnston and Cleland upon their motions. The entire action was then dismissed in February 1995 on consent of the parties, and refiled as an arbitration before the National Futures Association ("NFA"), by which time IBC had ceased trading.

In or around April 1994, IBC ceased to be a going concern. During the first five months of 1994, Johnston received distributions from IBC in excess of $120,000.

On or around May 8, 1996, Johnston retained Aegis J. Frumento ("Frumento") to represent IBC in the arbitration, on a referral from IBC's previous counsel, Stumpp & Bond. Shortly thereafter, Johnston retained David L. Leffler ("Leffler") as his personal attorney. Leffler had previously represented IBC.

A hearing on the arbitration scheduled by the NFA for May 29 and 30, 1996, was continued at IBC's request.

On June 13, 1996, Leffler took notes of a telephone conversation with Gary Stumpp ("Stumpp") of Stumpp & Bond. The notes indicated that Johnston could provide "some info that is very helpful" in order to obtain a judgment against IBC. The "info" apparently pertained to something "intentional" that Leahy did and for which "Leahy owes IBC."

Leffler then commenced discussions with Timothy J. Carey ("Carey"), Rotter's attorney in this action and at that time,

pertaining to the possibility of Johnston providing information to Rotter in exchange for a release from personal liability that might arise from the arbitration. In the course of discussions during the summer of 1996, at least one draft release agreement was prepared. On September 17 and 18, 1996, Rotter and Johnston signed a release (the "Release") under which Johnston agreed to assist Rotter in pursuing his claim against IBC in exchange for Johnston's release from any liability arising from Rotter's relationship with IBC.

At Johnston's direction, Frumento had refrained during this period from doing any work in connection with the arbitration, and, after the Release was signed, Frumento advised the NFA on September 19, 1996 that IBC would no longer participate in the arbitration and would not appear at the September 23, 1996 hearing. The same day, Carey moved for a default award, which the NFA granted on September 24, 1996, awarding Rotter in excess of $250,000, plus interest, costs, and attorney's fees. Judgment on the award was rendered in New York Supreme Court, New York County, in June 1997.

The arbitration award was calculated based on the difference between the lowest price at which the Order was partially filled—$25.50 (for 25 contracts)—and the prices at which the remaining 75 contracts were purchased. There is a factual dispute as to whether this award was excessive, as Leahy contends that he filled the Order at the best prices he could, in light of the volatility in the market after Baker's announcement.

On February 25, 1997, Johnston executed an affidavit for Rotter in which Johnston stated that in the spring of 1993, "Leahy indicated in connection with Rotter's order he had prearranged a trade with Maloney that had earned Maloney approximately $100,000. Maloney was supposed to have paid Leahy $30,000 of that amount but according to Leahy never did so."

On November 25, 1997, Rotter brought the instant action. Rotter's Complaint alleges that on January 9, 1991, Leahy and Maloney engaged in an illegal, prearranged trade involving 30 crude oil futures contracts for February 1991, which were part of the Order which Rotter placed with IBC and which Leahy executed. Leahy bought 30 of the 100 contracts from Maloney at a price of $29.00, allegedly $3.50 higher than the market price at the time of the transaction. These contracts were allegedly wrongfully assigned to Rotter's account, resulting in alleged damages of at least $100,000.

In addition, the Complaint alleges that when IBC dissolved in 1994, Leahy deliberately distributed IBC's assets to himself and to "one other shareholder"[2] without providing for the payment of a potential judgment on Rotter's pending claim. The Complaint also alleges that Rotter first learned of the alleged prearranged trade between Leahy and Maloney in January 1997.

The Complaint alleges two causes of action against Leahy and Maloney: (I) commodities fraud in violation of § 4(b) of the Commodity Exchange Act, 7 U.S.C. § 6b; and (II) common law fraud. Additional causes of action are alleged solely against Leahy: (III) breach of fiduciary duty for personal diversion of IBC assets; (IV) breach of fiduciary duty for the illegal trading; and (V) fraudulent conveyance of the IBC assets.

The TPC, in turn, alleges that Johnston was Chairman and President of IBC and solely responsible for handling IBC's dissolution. The TPC asserts six causes of action against Johnston: three counts alleging liability for the full amount of Rotter's claim against Leahy under (I) Delaware Code Ann. tit. 8 § 281(c) (director liability for creditor claims); (II) Del.Code Ann. tit. 8 § 282(b),(c) (shareholder re-

---

2. While not set forth in the Complaint, this shareholder is Johnston.

sponsibility for pro-rata share of claim or amount distributed to shareholder); (III) New York Debtor & Creditor Law §§ 273, 273–a (distribution of assets to Johnston for less than fair consideration), and § 276 (fraud); and three counts pertaining to Johnston's actions with respect to the distribution of IBC's funds upon dissolution allegedly not in accordance with Johnston's and Leahy's percentage ownership in IBC: (IV) breach of fiduciary duty; (V) breach of contract; and (VI) fraud.

Johnston testified at his deposition that the prearranged trade between Leahy and Maloney on January 9, 1991 involved 30 contracts for March 1991. Rotter testified at his deposition that Johnston did not tell him that a portion of the Order was filled through a prearranged trade, merely that a prearranged trade had occurred "around the order that I placed." Rotter did not trade March contracts on January 9, 1991.

Maloney and Leahy have submitted affidavits in which they deny that any prearranged trades took place between them. Leahy further states that he filled Rotter's Order at the market at the best prices he was able to obtain.

### Discussion

#### I. *Johnston's Motion to Dismiss*

Johnston moves, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings, seeking to dismiss the TPC. Johnston maintains that, based on the pleadings, the applicable law, and the Release, he cannot be liable under TPC claims (I), (II), and (III). As for TPC claims (IV), (V), and (VI), he asserts that the Court lacks jurisdiction. Since both Johnston and Leahy have submitted supplemental materials not contained in the pleadings in connection with this motion, it will be treated as a motion for summary judgment. *See* Fed.R.Civ.P. 12(c).

#### A. *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## B. Liability for TPC Claims (I), (II), and (III)

Leahy's TPC claims (I), (II), and (III) seek contribution or indemnity from Johnston with respect to Rotter's claims (III) and (V) asserted against Leahy in the Complaint. Johnston asserts that under the terms of the Release, read in light of New York General Obligations Law § 15–108, which governs release from contribution claims, Johnston cannot be liable for the claims Rotter asserts against Leahy, thus warranting dismissal of these claims as a matter of law. In response, Leahy contends (1) that Johnston has not satisfied his obligations under the Release, and that therefore the Release has not taken effect; (2) that the Release waives protection from contribution claims; (3) that it does not apply to claims sounding in indemnity; (4) that it was not made in good faith; and (5) that it is void as fraudulent and illegal as a breach of Johnston's fiduciary duties. These contentions will be addressed below.

New York General Obligations Law § 15–108 provides:

(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person.

### 1. Johnston Has Satisfied the Terms of the Release

Paragraph Five of the Release states, in pertinent part:

Subject to the rights and obligations contained in or arising out of this Release, Rotter [releases Johnston]. Upon the request of Johnston and provided all obligations of Johnston under this agreement have been satisfied, Rotter shall provide a written acknowledgment that Johnston has satisfied his obligations hereunder.

Leahy maintains that Johnston has not satisfied his obligations under the Release because Johnston has failed to provide Rotter with sworn testimony or an affidavit, and to attend hearings to enforce Rotter's arbitral award. Johnston has, however, provided an affidavit for Rotter. Moreover, the plain language of the Release states that Johnston is required to provide testimony or an affidavit only "at the request of Rotter." (Release ¶ 3.) Leahy does not maintain that any such request has been made. Furthermore, Johnston is not required to attend hearings; he is only required to "make himself available to testify" at hearings. (*Id.* ¶ 4.) Again, Leahy does not maintain that Johnston has not made himself available to testify. Additionally, Rotter is not required to provide Johnston with a written acknowledgment that Johnston has satisfied his obligations under the Release unless Johnston so requests. (*See id.* ¶ 5.) Leahy does not maintain that Johnston

has made such a request. Thus, while the Release is clearly conditional upon Johnston's performance of his obligations thereunder, Leahy makes no proper contention that Johnston has failed to perform those obligations. As such, Leahy's claim that the Release has not yet taken effect is insupportable.

### 2. *The Release Does Not Waive Johnston's Protection From Contribution Claims Under § 15–108*

■ Leahy maintains that the last sentence of paragraph 4 of the Release waives the protection of § 15–108 for Johnston. That sentence reads:

> Rotter further agrees that in connection with the settlement of any action against IBC or its principals, that he will obtain a release of all claims relating in any way to the Arbitration or any action to enforce an award that any parties to such action may have against Johnston.

It is difficult to see how this language waives the protection of § 15–108. The sentence simply indicates that Rotter is not permitted to settle with IBC (or Leahy) without obtaining a release for Johnston from IBC (or Leahy). The sentence actually reinforces the protections of § 15–108.

Section 15–108 was enacted "in an effort to strike a better balance between the often competing policies of encouraging settlement and providing for equitable sharing of liability among tort-feasors." *Mitchell v. New York Hosp.,* 61 N.Y.2d 208, 215, 473 N.Y.S.2d 148, 461 N.E.2d 285 (1984). Waiver of § 15–108's protections must be "freely, knowingly and openly agreed to." *Id.* at 216, 461 N.E.2d 285, 473 N.Y.S.2d 148. *Mitchell* is illustrative in this regard. The plaintiff in that case, a steamfitter, was injured at a work site when he was scalded by steam escaping from a ruptured pipe. He sued the hospital at which the injury occurred. The hospital, in turn, commenced a third-party action against plaintiff's employer and various other contractors and subcontractors which the hospital had hired to perform the work. Before trial, the plaintiff, the defendant hospital, and the various third-party defendants reached a settlement under which plaintiff received $550,000 from the hospital, and the hospital explicitly in the language of the release preserved its rights of contribution from, and indemnification by, the third-party defendants. The New York Court of Appeals held that under the settlement agreement, the third-party defendants waived their right to protection under § 15–108. *See Mitchell,* 61 N.Y.2d at 211–14, 217, 473 N.Y.S.2d 148, 461 N.E.2d 285. The facts of the instant dispute are far different, of course. The inclusion of the language of the last sentence in Paragraph 4 of the Release does not waive, for Johnston, the protection of § 15–108. It is not the free, knowing, and open waiver required by the law.

### 3. *There Are Factual Questions Regarding Whether the Release Was Negotiated in Good Faith*

■ Section 15–108(b) requires that the release be given "in good faith" by the injured party in order for the tortfeasor to be relieved from contribution liability. "The good faith requirement, ... is to assure that the injured party will not collusively release one wrongdoer for a small amount in return for the promise of that wrongdoer to cooperate improperly with the injured person in an attempt to extract from the remaining wrongdoers more than the equitable share of the damages attributable to them. The requirement permits the Court to determine whether the transaction was collusive." *Friend v. Dibble,* 124 Misc.2d 151, 153, 475 N.Y.S.2d 765, 766 (Sup.Ct.1984); *see Torres v. State,* 67 A.D.2d 814, 814, 413 N.Y.S.2d 262, 263 (4th Dep't 1979). "The good-faith requirement depends upon all the facts alleged, not just upon the amount of the settlement. A release even for nominal damages will not be evidence of collusion or bad faith if the record otherwise supports allegations of good faith." *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959 & 5056(RWS), 1993 WL 362364, at *18 (S.D.N.Y. Sept. 17, 1993)

(*citing Friend v. Dibble,* 124 Misc.2d 151, 475 N.Y.S.2d 765).

■ The record before the Court raises a genuine question of bad faith on the part of Johnston. First, Johnston paid no consideration for the Release. Absent evidence of collusion, of course, lack of consideration is not determinative. Here, however, such evidence exists. The Release was negotiated during August and September of 1996, during which time Johnston instructed the IBC attorney, Frumento, to do nothing regarding the pending arbitration. Indeed, the day after the Release was signed, IBC defaulted in the arbitration on orders from Johnston. Although Rotter's counsel claims that Rotter had no knowledge of Johnston's plan to order IBC's default, the circumstances suggest the possibility of collusion. Johnston would be well-served by providing Rotter with evidence of a prearranged trade by Leahy, if doing so would relieve Johnston of his own liability as an officer and director of IBC who had himself received a possible unlawful distribution from IBC in 1994. Rotter would also be well-served, since IBC had no assets and Rotter's only chance of any real monetary recovery might be through Leahy.

In addition, Rotter has not provided an affidavit denying any knowledge that IBC might default in the arbitration proceeding after the Release was signed.

In sum, the facts suggesting a possible finding of collusion between Rotter and Johnston to support a claim of bad faith suffice to deny Johnston's motion to dismiss claims (I), (II), and (III) of the TPC.

The possibility of bad faith is, in and of itself, reason to deny Johnston's motion. But there is also a serious question regarding whether Johnston breached his fiduciary duties to IBC and to its shareholders (in particular, Leahy) by ordering the arbitration default. Facts have been set forth in connection with Maloney's motion suggesting that the arbitral award was far larger than it should have been,

even if one were to side with Rotter on all questions of fact raised therein. Johnston's possible breach of fiduciary duty is yet another reason to deny his motion to dismiss the TPC. Finally, some of the counts in the TPC possibly sound in indemnity, and thus would not be affected by § 15–108. § 15–108 "defines and limits only the right to contribution; it has no bearing on the right to indemnity.... In contribution, the liability is *shared* among wrongdoers who are *in pari delicto.* Indemnity involves *shifting* the entire loss from one defendant to another." Joseph M. McLaughlin, Practice Commentaries, N.Y. C.P.L.R. § 15–108 p. 702. Johnston has not disputed Leahy's contention that TPC counts (I) and (III) sound in indemnity. Due to the Court's ruling with respect to the bad faith allegation, however, it is not necessary to reach these additional contentions.

### C. *Supplemental Jurisdiction Exists Over Claims (IV), (V), and (VI)*

■ The exercise of supplemental jurisdiction over claims for which a federal district court does not possess original jurisdiction is governed by 28 U.S.C. § 1367. Section 1367(a) provides, in pertinent part, that:

> Except as provided in subsection[ ] ... (c), in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

A non-original claim is part of the same constitutional "case" under Article III if it derives from the same "common nucleus of operative fact" as the claim over which the court has original jurisdiction. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). All of the claims in the Complaint are claims over which this Court has

original jurisdiction. Claim (I) alleges commodities fraud in violation of 7 U.S.C. § 6b, thereby conferring federal jurisdiction under 28 U.S.C. § 1331. Claims (II)-(V) are state law claims over which the court has original jurisdiction under 28 U.S.C. § 1332, the diversity statute, as Rotter has a different domicile than Leahy and Maloney.[3]

Counts (IV), (V), and (VI) of the TPC pertain to Johnston's actions with respect to the distribution of IBC's funds upon dissolution allegedly not in accordance with Johnston's and Leahy's percentage ownership in IBC: count (IV) sounds in breach of fiduciary duty; count (V) in breach of contract; and count (VI) in fraud. Each of these counts arises out of the same nucleus of operative facts as counts (III) and (V) in the Complaint. Count (III) of the Complaint charges Leahy with breach of fiduciary duty for personal diversion of IBC assets; count (V) charges him with fraudulent conveyance of those assets. The operative facts of all of these claims will concern whether any assets were distributed during the dissolution of IBC; if so, who authorized or made the distribution, and who received it. This is a small cluster of facts—the very nucleus contemplated by *Gibbs* and codified in § 1367. Therefore, supplemental jurisdiction exists over these claims, and the motion to dismiss is denied.

## II. *Leahy's Motion To Amend the Pleadings*

Leahy has moved, pursuant to Federal Rules of Civil Procedure 15(a) and 13(f), to amend both his answer to the Complaint and his TPC.

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." In this Circuit, a party is generally afforded leave to amend its pleadings under Rule 15(a) "in the absence of a showing by the nonmovant of preju-

dice or bad faith." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993). Typically, the moving party's delay, standing alone, is not sufficient reason to foreclose amendment. *See id.; R.G.N. Capital Corp. v. Yamato Transport USA, Inc.*, No. 95 Civ. 2647(CSH), 1997 WL 3278, at *1 (S.D.N.Y. Jan. 3, 1997). However, as the Second Circuit observed in *Block*, " '[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.' " *Block*, 988 F.2d at 350 (*quoting Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir.1983)). In evaluating whether the nonmovant will suffer "prejudice," a court must consider whether amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial," "significantly delay the resolution of the dispute," or prevent the plaintiff from bringing a timely action in another jurisdiction. *Block*, 988 F.2d at 350. Alternatively, amendment may be precluded where such amendment would be futile. *See Schare v. Six Flags Theme Parks*, No. 96 Civ. 9377(RWS), 1998 WL 24361, at *3 (S.D.N.Y. Jan.23, 1998).

A review of this Circuit's case law concerning the "futility" of amendment indicates that, in the main, a proposed amendment should be reviewed under a standard analogous to the standard of review applicable to a motion brought under Rule 12(b)(6), Fed.R.Civ.P. *See Aniero Concrete Co. v. New York City Construction Auth.*, Nos. 84 Civ. 9111, 95 Civ. 3506, 1998 WL 148324, at *7 (S.D.N.Y. Mar.30, 1998); *Finlay v. Simonovich*, No. 97 Civ. 1455(AJP)(DAB), 1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997). Rotter acknowledges that a 12(b)(6) standard governs.

In reviewing a motion to dismiss under Rule 12(b)(6), a court must "accept as true the factual allegations of the [pleading], and draw all inferences in favor of the

---

**3.** Section 1367(b) does not apply in this case, since jurisdiction is not predicated solely on diversity, but also on federal question (§ 1331) jurisdiction.

pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993)). Dismissal is warranted only when "the [pleader] cannot recover [or make out a defense] on the facts he has alleged." *Id.*

### A. *The Answer*

Leahy's motion to amend his answer is unopposed save for the assertions of a tenth affirmative defense and of a counterclaim alleging that Rotter induced, aided and abetted, and participated in Johnston's breach of his fiduciary duties (authorizing IBC's default in the NFA arbitration and propounding false allegations relating to Leahy's prearranged trading) by agreeing to release Johnston from liability for Rotter's claims against IBC in return for Johnston's testimony against Leahy. Rotter opposes amendment of the answer to include these allegations on the grounds that: (1) the counterclaim is barred by the applicable statute of limitations; (2) Leahy fails to set forth any well-pleaded allegations from which Rotter's knowing participation in the alleged breach may be inferred; (3) Leahy fails to allege all the elements of a defense based on the doctrine of equitable estoppel; (4) the motion to amend was brought in bad faith, as discovery has not produced any facts to support Leahy's allegations; (5) permitting the amendment would prejudice Rotter. Alternatively, Rotter maintains that Leahy should be required to replead the Tenth Affirmative Defense and counterclaim. These contentions will be addressed below.

### 1. *The Statute of Limitations*

■ Actions for equitable relief for breach of fiduciary duty have a six-year statute of limitations, while actions seeking monetary damages for such breach have a three-year statute of limitations. *See Loengard v. Santa Fe Indus.,* 70 N.Y.2d 262, 266, 519 N.Y.S.2d 801, 514 N.E.2d 113 (1987); *Yatter v. William Morris Agency, Inc.,* 256 A.D.2d 260, 682 N.Y.S.2d 198, 199

(1st Dep't 1998). Rotter maintains that the three-year period applies, since Leahy's counterclaim seeks only monetary relief. Rotter also maintains that the limitations period began to run in September 1996, when the NFA entered the default arbitral award against IBC. As this counterclaim was not asserted until November 23, 1999, Rotter claims that it is time-barred.

■ As an initial matter, the Court notes that the Tenth Affirmative Defense sounds in equity: Leahy seeks to estop Rotter from pursuing his action due to the aiding and abetting of breach of fiduciary duty. (*See* Proposed Amended Answer, ¶ 33.) As for the counterclaim, there is a factual dispute as to whether Leahy should have learned of IBC's default in September 1996. Even if, as Rotter claims, Leahy had an obligation as an IBC director to keep informed of the arbitral proceedings, Leahy has alleged that the breach of fiduciary duty was fraudulently concealed from him, which could toll the limitations period. Embedded in this dispute are factual questions not properly resolved on a motion to dismiss.

### 2. *The Sufficiency of the Allegations*

■ Rotter also maintains that discovery has not produced any evidence permitting a reasonable inference to be drawn that would implicate Rotter's knowing participation or substantial assistance in Johnston's decision to allow IBC's default. Again, this contention is vigorously disputed by Leahy. Thus, a motion to dismiss is not the proper context in which to resolve this question. As indicated above in the discussion of Johnston's motion, the circumstances under which the Release was negotiated were questionable and, at the very least, under the 12(b)(6) standard, the Court is required to draw the inference in favor of Leahy. For this reason as well, the Court cannot conclude that Leahy brought the motion in bad faith.

### 3. The Failure to Plead All Elements of An Equitable Estoppel Defense

Rotter next alleges that Leahy has failed to plead any of the elements of a defense of equitable estoppel, the relief he seeks in the Tenth Affirmative Defense.

■ An estoppel claim "requires the presence of three elements: '(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated.'" *Cular v. Metropolitan Life Ins. Co.*, 961 F.Supp. 550, 556 (S.D.N.Y. 1997) (*quoting United States, for the Use and Benefit of Robert DeFilippis Crane Service, Inc. v. William L. Crow Constr. Co.*, 826 F.Supp. 647, 656 (E.D.N.Y.1993)). Rotter is correct that Leahy has not alleged in his proposed amended answer any of the elements of an equitable estoppel defense. Nor does Leahy in his supporting papers supply allegations sufficient to overcome the defect. In particular, there is no indication of detrimental reliance. The Tenth Affirmative Defense will therefore be stricken.

### 4. Prejudice

Delay is an insufficient reason to deny a motion to amend. *See Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234–35 (2d Cir.1995) (granting leave to amend pleadings over four years after the complaint was filed). Rotter must make a showing of substantial and undue prejudice resulting from the delay. *See Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. 504, 506 (S.D.N.Y.1992); *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F.Supp. 1071, 1078 (S.D.N.Y.1990) (granting motion to amend that was submitted over three years after filing complaint since plaintiff set forth "colorable grounds" for amendment and defendant would not be unduly prejudiced).

■ In determining what constitutes "prejudice," the Court must consider whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction. *See Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993). The resulting prejudice must be more than is appropriate or justified. *See Doe v. Columbia Univ.*, 165 F.R.D. 394, 397 (S.D.N.Y.1996). Having expended time, effort and money in litigating a matter does not constitute the "substantial prejudice" necessary to deny leave to amend a complaint. *Block*, 988 F.2d at 350. Leave to amend has been appropriate, although it may have required the parties to reopen completed depositions and file additional pleadings, and necessitated the disqualification of defendants' counsel. *See Doe*, 165 F.R.D. at 396–97. Rotter has not asserted any facts indicating that he would be unduly prejudiced by Leahy's amendment of his answer at this time.

For these reasons, Leahy will be permitted to amend his answer to add the counterclaim. He will not be permitted to add the Tenth Affirmative Defense.

### B. The TPC

Leahy seeks to add two additional claims against Johnston. Count (VII) seeks indemnity from Johnston for any judgment Rotter might obtain against Leahy; Count (VIII) alleges that Johnston violated his fiduciary duties to Leahy through the various acts already discussed. Johnston has not opposed these amendments other than by asserting that they should not be permitted on the same grounds under which he has moved to dismiss the TPC. As set forth above, however, Johnston's motion has been denied, and the additional counts raise essentially the same issues as the counts previously considered. Thus, Leahy is permitted to

amend the TPC to add counts (VII) and (VIII).

### III. *Maloney's Motion for Summary Judgment*

Maloney has moved for summary judgment on the two claims asserted against him: fraud under the Commodity Exchange Act, and common law fraud. Maloney asserts that (A) the statute of limitations has expired for both causes of action; and (B) Rotter cannot prevail on the merits of the claims.

### A. *The Statute of Limitations Has Not Expired*

#### 1. *The Commodity Exchange Act Claim*

Rotter's first claim against Maloney is brought under the Commodity Exchange Act (the "CEA"), 7 U.S.C. § 6b. A private action under the CEA must be brought within two years after the date the cause of action arises. *See* 7 U.S.C. § 25(c); *Kolbeck v. LIT America*, 923 F.Supp. 557, 564 (S.D.N.Y.1996), *aff'd* 152 F.3d 918, 1998 WL 406036 (2d Cir.1998). As *Kolbeck* states:

> A claim under the CEA arises when plaintiffs are put on inquiry notice of a potential claim. That is, the claim accrues and the limitations period starts to run when circumstances would suggest to a person of ordinary intelligence the probability that he has been defrauded. *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir.1994); *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993). At that point, the investor assumes a duty of inquiry, and knowledge will be imputed to the investor even if he does not make that inquiry. *Dodds*, 12 F.3d at 350.

*Kolbeck*, 923 F.Supp. at 564.

Rotter has acknowledged that he suspected he had been defrauded in connection with the futures trade that forms the basis of this action almost immediately, that is, while he was still on the telephone awaiting confirmation of the Order. However, he had no reason at that time to suspect that Maloney was involved in the fraud. Moreover, Rotter acted promptly on his suspicions at the time by lodging a complaint with NYMEX and subsequently filing the federal action in California.

Sometime in 1993, Rotter received Leahy's trading card listing the allegedly fraudulent trades, from which it would be possible to identify Maloney, through the badge name "SLIP," as a trader with whom Leahy executed certain trades. However, the claims in the 1993 Action were not predicated on a theory of prearranged trades, but on a theory of misallocation: that Leahy had improperly allocated the better-priced contracts to customers other than Rotter.

Construing the disputed facts in the light most favorable to the non-moving party, Rotter did not learn of the possibility of a pre-arranged trade between Maloney and Leahy until October 1996. This is the appropriate date from which to calculate time to assess the running of the limitations period. Although Rotter suspected fraud as early as January 9, 1991, he did not fail in his duty to make inquiry: he filed a complaint with NYMEX and subsequently filed the 1993 Action. The doctrine of equitable tolling has been held to apply to actions brought pursuant to the CEA. *See Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516, 521 (10th Cir.1988). "Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir.1993) (*quoting Arneil v. Ramsey*, 550 F.2d 774, 781 (2d Cir.1977) (*quoting Morgan v. Koch*, 419 F.2d 993, 997 (7th Cir. 1969))). This is an appropriate situation in which to invoke the equitable tolling doctrine. Rotter has exercised reasonable care and diligence in seeking to learn of the nature of the alleged fraud. It would be inequitable to bar this action on the

grounds that the statute of limitations had run.

### 2. *The Common Law Fraud Claim*

The limitations period on Rotter's common law fraud claim is set by New York C.P.L.R. §§ 203(g) & 213(8), which provide that a fraud action must be commenced within six years from the time the fraud took place, or within two years from the time the plaintiff discovered, or with reasonable diligence could have discovered, the fraud, whichever period is longer.

For the reasons set forth above, construing the facts in Rotter's favor as required on a summary judgment motion, October 1996 is the time when Rotter with reasonable diligence could have discovered the alleged fraud. As the instant action was filed on November 25, 1997, the limitations period has not run.

### B. *Maloney Is Entitled to Summary Judgment on the Merits*

■ Rotter has not put forward any evidence admissible against Maloney to support his claims of fraud based on a prearranged trade between Leahy and Maloney of 30 February 1991 contracts, which allegedly constituted part of the fill of Rotter's Order. The only evidence to support this claim is Johnston's affidavit, which states that in the spring of 1993, when IBC was seeking to hire a heating oil broker and Johnston suggested to Leahy that IBC hire Maloney:

> Leahy said unequivocally that we should not hire Maloney. Leahy indicated in connection with Rotter's order he had prearranged a trade with Maloney that had earned Maloney approximately $100,000. Maloney was supposed to have paid Leahy $30,000 of that amount but according to Leahy never did so. According to Leahy, when he complained to Maloney about not getting the

$30,000, Maloney simply told him, "Deal with it."

(Johnston Aff. ¶ 24.)

This statement is not admissible against Maloney. It is hearsay and does not fall within any exception to the hearsay rules.

Rotter asserts that the statement is not hearsay because it was made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E). "Coconspirator statements may be found to be 'in furtherance' of the conspiracy ... if they prompt the listener to respond in a way that facilitates the carrying out of criminal activity." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir.1989) (*quoting United States v. Rahme*, 813 F.2d 31, 35 (2d Cir.1987)). Leahy's statement, if anything, merely prompted Johnston to refrain from hiring Maloney. It can hardly be construed as facilitating "the carrying out of criminal activity." Moreover, it is clear from the affidavit that the statement was not made during the course of the conspiracy. Leahy indicates unequivocally that Maloney had withdrawn from any purported conspiracy when Maloney indicated that he would not pay Leahy his purported $30,000 share.

Because this evidence is inadmissible against Maloney, and because it is the only evidence Rotter has put forward to support his allegation of Maloney's wrongdoing in connection with the Order, summary judgment for Maloney is appropriate.

■ Furthermore, even if Leahy's statement were deemed to be admissible, it would have to be weighed in light of Johnston's testimony—which he stuck to after repeated questioning by counsel—that the pre-arranged trade between Leahy and Maloney involved March 1991 contracts, not February contracts. Rotter's Order did not involve any March contracts. Thus, the prearranged trade to which Johnston referred could not have been part of Rotter's Order.

Rotter nevertheless contends that the sale of the 30 March contracts cannot be considered "in isolation," but must be viewed in light of the alleged violations in the manner in which Leahy filled out his trading card, of the fact that Rotter was unable to obtain confirmation of the prices at which the Order was filled over the phone, and of the alleged discrepancies between the prices at which the Order was filled and the times at which such prices were being quoted in the pit at the NY-MEX. Yet, even construing the facts in the light most favorable to Rotter, these facts only possibly implicate Leahy; none implicates Maloney in any way. The facts that are in dispute are simply not material to Maloney's motion. Thus, even if the evidence from Johnston were deemed to be admissible against Maloney, it would still be insufficient as a matter of law to support a claim of fraud based on a prearranged trade. Summary judgment is therefore appropriate.

## C. *Sanctions Will Not Be Granted*

Maloney also seeks sanctions under Rule 11 of the Federal Rules of Civil Procedure, on the grounds that the action is frivolous because it is clearly barred by the statute of limitations and because it is based entirely on an inadmissible and irrelevant statement attributed by Johnston to Leahy.

Rule 11 places an affirmative duty on each attorney to conduct reasonable inquiry into the viability of a pleading before it is signed. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985). Simply put, an "attorney must 'stop, look and listen' before signing a document subject to Rule 11." *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir.1988) (*quoting Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 157 (3d Cir.1986)).

As the Second Circuit held in *Eastway*, Rule 11 is triggered and an attorney and/or his client may be sanctioned when it appears that a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law. *See Eastway*, 762 F.2d at 254; *see also O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 705 (2d Cir.1990). Therefore, in applying Rule 11, a court must assess whether an attorney's conduct was objectively reasonable at the time he or she signed the pleading, motion, or other paper. *See International Shipping Co. v. Hydra Offshore, Inc.*, 875 F.2d 388 (2d Cir.1989); *Oliveri v. Thompson*, 803 F.2d 1265, 1274–75 (2d Cir.1986); *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 48 (S.D.N.Y.1993).

The substantive requirement imposed on an attorney or party by Rule 11 is that "[p]leadings, motions, and other papers be justifiable at the time they are signed." *United States v. International Bhd. of Teamsters*, 948 F.2d 1338, 1344 (2d Cir.1991). It follows, then, that a court must neither "allow hindsight to skew judgment" nor "countenance belated rationalizations concocted to conceal chicanery." *Id.* Moreover, the court in *Eastway* concluded that Rule 11 sanctions are appropriate "where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands . . . ." *Eastway*, 762 F.2d at 254. Sanctions must, however, be imposed carefully, lest they chill the creativity essential to the evolution of the law. *See Murphy v. Cuomo*, 913 F.Supp. 671, 682 (N.D.N.Y. 1996); *see also Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir.1994).

Sanctions are not appropriate here. As set forth above, factual ambiguities prevent a determination at this time that the statute of limitations had run on Rotter's claims against Maloney at the time this action was initiated. And, while

summary judgment is appropriate due to Rotter's failure to produce any admissible evidence with regard to Maloney, at the time of the filing of the action Johnston's affidavit provided Rotter's counsel with a reasonable belief that a colorable claim of fraud existed. That after discovery, such claim is revealed to be without evidentiary support is not a sufficient basis on which to impose sanctions.[4]

### Conclusion

For the reasons set forth above, Johnston's motion to dismiss is denied. Leahy's motion to amend his TPC and his answer to the Complaint, save for the tenth affirmative defense, is granted. Maloney's motion to dismiss is granted and his motion for sanctions is denied. Leahy's amended answer and TPC shall be served on all parties and filed with the clerk of the court within twenty days of the date of this opinion.

It is so ordered.

---

**4.** The motion also fails to comply with the procedural requirements of Rule 11.